UNITED STATES of America, Appellee,

v.

Gilberto MONTOYA, Appellant.

No. 91–1369.

United States Court of Appeals,
Eighth Circuit.

Submitted Aug. 26, 1991.

Decided Dec. 26, 1991.

Steven M. Watson, Omaha, Neb., argued, for appellant.

Donald L. Schense, Omaha, Neb., for appellee.

Before FAGG, BOWMAN and LOKEN, Circuit Judges.

LOKEN, Circuit Judge.

Gilberto Montoya appeals his conviction and sentence for conspiring to distribute and distributing cocaine. He contends that the government's failure to disclose in discovery payments to a prosecution witness warrants a new trial, and that marijuana he negotiated to buy in an unrelated transaction should not have been included in determining his offense level for sentencing purposes. We affirm Montoya's conviction, but remand for resentencing.

I.

In June 1989, Florida residents Montoya and Juan Garcia–Escobar drove from Miami to Omaha with two kilograms of cocaine concealed in a cooler. They delivered it to their customer, Kevin Dobson, in the presence of Mike Dillon, Dobson's friend and a cocaine and marijuana user. Montoya and Garcia–Escobar remained in Omaha for several days until Dobson had sold enough of the cocaine to pay them for one kilo. They then returned to Miami where they were arrested some months later.

Montoya was indicted for conspiring with Garcia–Escobar and Dobson to distribute cocaine, and for distributing the two kilos in Omaha. Garcia–Escobar and Dobson pleaded guilty and testified at Montoya's trial. Dillon and Dobson's girl friend also

(*Maleng* permits habeas challenge to current sentence as enhanced by expired sentence).

testified under agreements not to prosecute. Each of these witnesses directly implicated Montoya in the two-kilo transaction. Montoya testified in his own defense, categorically denying all drug dealing activity in Florida, Omaha, and elsewhere. On November 8, 1990, the jury found him guilty of both counts.

On November 21, 1990, Montoya moved for a new trial, alleging (as the government now admits) that Dobson was paid nearly $1,000 "during the period of the conspiracy," that the government did not disclose these payments despite specific discovery demands for information about any such arrangements,[1] and that Montoya's attorney had only learned of the payments on November 19 while talking to the prosecutor in another case then being tried. The district court denied that motion. Montoya contends on appeal that the district court erred in refusing to grant a new trial because of this newly discovered evidence.

The government's payments to Dobson, and whatever agreement lay behind those payments, were clearly evidence that might have impeached this prosecution witness by showing bias or interest. It is well settled that a new trial must be granted when the prosecution fails to disclose such evidence before trial if the evidence is material, that is, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

▮ Here, we agree with the district court that Montoya's new evidence is not material. In the first place, Dobson's trial testimony implicating Montoya was corroborated by Garcia–Escobar, by Dillon, by

Dobson's girl friend, and by various undisputed facts. Thus, it is highly unlikely that this kind of impeachment would have resulted in an acquittal.[2] *See United States v. Mesa,* 660 F.2d 1070, 1076 (5th Cir.1981). Second, the defense thoroughly cross-examined Dobson at trial. Dobson's plea agreement was placed into evidence, and his credibility was attacked by cross examination emphasizing Dobson's hope that, because he testified against Montoya, the government would move at Dobson's sentencing for a downward departure and he would receive a lenient sentence. Thus, the evidence that he received these payments would have provided only cumulative impeachment, and the district court correctly denied Montoya's motion for a new trial. *See United States v. Gilbert,* 668 F.2d 94, 96–97 (2d Cir.1981).

## II.

Montoya also attacks his sentence. He argues that the district court improperly considered an attempted Florida marijuana buy in determining his offense level under the Guidelines. Because Montoya took the stand and broadly asserted that he had never engaged in drug dealing, the prosecution's case included evidence of three additional drug transactions—a kilo of cocaine that Montoya provided to Garcia–Escobar for delivery in Michigan in February 1989, a kilo of cocaine found in Montoya's car at the time of his arrest in Miami in January 1990, and 4,900 pounds of marijuana that Montoya negotiated to puchase in Lakeland, Florida in September 1989.

Adopting the position taken in Montoya's presentence report, the district court found that all of these transactions were part of the offense of conviction under U.S.S.G. § 1B1.3(a)(2). The court then determined Montoya's offense level to be 37 and sen-

---

1. The record is unclear whether Montoya's prosecuting attorney knew of these payments and whether their non-disclosure violated a discovery order. However, we need not dwell on these questions because the new trial issue does not depend upon "the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

2. The district court noted in denying the motion for new trial that Dobson had testified in the later trial of another cocaine supplier, that he was an important witness in both cases, that he had been cross examined about the payments in the second trial, and that the second jury had convicted the other supplier.

tenced him to 215 months in prison followed by four years of supervised release. On appeal, Montoya contends that the marijuana negotiations were completely unrelated to the Omaha cocaine conspiracy and therefore should not have affected his sentence. Excluding this marijuana, Montoya's offense level would be 33, producing a guideline imprisonment range of 135–168 months.

Section 1B1.3(a)(2) defines "Relevant Conduct," that is, conduct to be considered in determining the guideline range. It specifically includes "all [of the defendant's] acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." The commentary explains that, "in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." However, "same course of conduct" and "common scheme or plan" are not otherwise defined.

■ We dealt with this question at length in *United States v. Lawrence,* 915 F.2d 402 (8th Cir.1990). After noting that the clearly erroneous standard applies to a district court's determination of the quantity of drugs for sentencing purposes, we held in *Lawrence* that distribution of marijuana and cocaine can both be part of the same course of conduct if the facts reveal a "continuous pattern of drug activity." *Id.* at 406–408. When the government proposes to include additional drug transactions for sentencing purposes, the question is whether there is " 'sufficient similarity and temporal proximity to reasonably suggest that repeated instances of criminal behavior constitute a pattern of criminal conduct.' " *Id.* at 407, quoting *United States v. Santiago,* 906 F.2d 867, 872 (2d Cir. 1990). If this standard is satisfied, transactions in other types of drugs at different times and locations may properly be considered in assessing a sentence, particularly when a conspiracy has been proved. *See*

*United States v. Payne,* 940 F.2d 286, 293 (8th Cir.1991).

The district court expressed serious reservations about including Montoya's attempted purchase of 4,900 pounds of marijuana but stated that this court in *Lawrence* took the "broad view" of § 1B1.3(a)(2). Although we did adopt what some have called the "broad view" of the phrase "same course of conduct," we did not mean to suggest that the Guidelines permit totally unrelated drug transactions to be combined for sentencing purposes. Thus, Montoya's appeal requires us to examine the relationship between the Omaha cocaine conspiracy and the Florida marijuana negotiations.

Montoya was convicted of a conspiracy to distribute cocaine in Omaha in June 1989. The alleged conspirators were Montoya, Garcia–Escobar, and Dobson. Although the only transaction proved was the transporting from Florida and the distribution in Omaha of two kilos of cocaine in June 1989, the testimony tended to prove that the conspirators viewed this transaction as the start of a continuing relationship.

The record reveals far less about the marijuana negotiations, which were briefly described by one of the prosecution's rebuttal witnesses at trial. The negotiations occurred at a hotel in Florida in September 1989 as part of Operation Corinthian, a local marijuana sting operation. The witness stated that Montoya was present as one of the potential buyers, but he could not define Montoya's role in the negotiations because the buyers spoke only in Spanish. The purchase never took place, and the reason why the negotiations were unsuccessful is unclear. None of the other individuals involved in the Omaha cocaine conspiracy was present at the Florida negotiations, and cocaine was not involved.

There is nothing in the record linking these Florida marijuana negotiations with the Omaha cocaine conspiracy. However, there is one vague link between Montoya, marijuana, and Omaha. Dobson's friend Dillon, an admitted marijuana user and distributor, testified that he had a "conversa-

tion" (Dillon does not speak Spanish and Montoya does not speak English) with Montoya in which Dillon

> mentioned that I was not liking cocaine too much, that I was getting very tired of doing it and I didn't like it around me.
>
> I was scared of it and that I like doing marijuana and I gestured by going, smoking (indicating), and he understood that, and he ... mentioned sensimilla.... That is a seedless marijuana.
>
> *    *    *    *    *    *
>
> Q. After he said sensimilla, after you made that gesture of smoke to your mouth, what happened then?
>
> A. He just nodded yes, that he understood, but he really didn't say anything much about it.

This testimony may be related to an almost offhand comment by Dobson during his direct testimony:

> Q. Mr. Dobson, what was that discussion in regards to fronting cocaine to you from Miami from Mr. Montoya and Juancho [Garcia–Escobar]?
>
> A. Juancho had told me that [Montoya] said that he would bring me up six kilos of cocaine and leave them with me, that I could sell it at my leisure along with a couple hundred pounds of pot ... for Mike Dillon to sell at his leisure....

■ We conclude that these two statements are insufficient to establish that Montoya's participation in an attempt to buy 4,900 pounds of marijuana in central Florida was the "same course of conduct" as his participation in the conspiracy to distribute cocaine in Omaha three months earlier. The only common element between the two events is the presence of Montoya. That is not enough by itself to establish a "continuous pattern of drug activity." *Compare Lawrence,* 915 F.2d at 407–408 (cocaine and marijuana distributed in same location; defendant's marijuana source was also a major cocaine dealer;

there was at least one common customer; defendant admitted possession of cocaine during the marijuana conspiracy).[3]

The record clearly reflects that Florida law enforcement officials believed Montoya was a dealer of both cocaine and marijuana. That may well be true, and if he had been prosecuted in Florida for his drug operations there, the marijuana transaction might have been properly considered in his sentencing. But he was prosecuted in the District of Nebraska for participating in an Omaha cocaine conspiracy. While the Guidelines permit inclusion of additional transactions in determining his offense level, they require some meaningful relationship among them before discrete transactions in different drugs may be attributed to the "same course of conduct" or a "common scheme or plan." Proof of such a relationship was simply lacking here.

■ We also emphasize that this is a fact intensive inquiry in which the district court is given broad discretion to assess the relevant facts. Here, the district court was reluctant to include the marijuana transaction but felt compelled to do so by our decision in *Lawrence.* We did not intend that *Lawrence* be read so broadly. Accordingly, we vacate Montoya's sentence and remand this case to the district court for resentencing.

---

3. We also compare the marijuana transaction to the drug transaction Montoya concedes was properly included in his offense of conviction, the kilo of cocaine delivered to Michigan. Like the Omaha conspiracy, that transaction involved distribution of cocaine, transported in the same manner, in a similar quantity, and by the same person, Garcia–Escobar, as the two kilos distributed in Omaha. No such similarities exist between the Omaha conspiracy and the attempted marijuana buy.